May it please the Court, my name is Joe Oliveri and I represent the appellants in this case. Your Honors, this appeal presents a simple, straightforward question. Whether an intentionally manipulated video that showed advocates physically incapable of responding to a basic question at the heart of their advocacy is false and capable of responding to that question for over six minutes? It absolutely is. The District Court erred in three ways. First, the District Court erred by finding the film not defamatory. The proper standard is whether the film was reasonably capable of being understood as defamatory. In order to affirm, this Court would have to hold that the film was incapable of lowering the plaintiffs in the estimation of even a substantial and respectable minority of viewers. But as the plaintiffs pleaded, the film did just that. And we know that is true because as the plaintiffs pleaded, even a Washington Post writer who saw the film wrote that it, quote, provides viewers a moment to lower their estimation of the plaintiffs. Secondly, the District Court erred in finding the film not false. Defendants did not move to dismiss on the ground of falsity. And in fact, Katie Couric admitted that defendants misrepresented her exchange with the plaintiffs. But the District Court, sua sponte, dismissed on falsity based on its own subjective opinion that plaintiffs did not answer the question posed by Couric. That was erroneous fact-finding. Third, the District Court erred in finding the film not of and concerning the VCDL. Most notably, the film expressly refers to the VCDL by name in connection with defamatory exchange. Again, to affirm, this Court would have to hold that no person who knew or knew of the VCDL could reasonably conclude that the film was about the VCDL. Plaintiffs more than adequately pleaded of and concerning, and Defendant Couric even admitted that she asked her questions, quote, to the VCDL and later published part of, quote, the VCDL response. To find that the District Court, or to find in your favor here, are we now required, from your perspective, to find error on all three points? In other words, if we found, yes, District Court did error on, let's say, two and three, but not one, then you still do not prevail.  Yes, with a caveat. With the of and concerning point, that only involved Plaintiff VCDL, so if you were to find that the film was not of and concerning the VCDL, Plaintiff's Webb and Hawes' claims would still prevail. But if we were to, let's say, take the first one with defame, and you were to find out that the Court correctly determined that under the existing case law, which there's a number of cases that address that particular point, the Court was correct, then we need not reach the remaining part, because that's sufficient to uphold the District Court. That is correct, Your Honor. But I think, and particularly, well, with all three, with the defamatory meaning, to take that example, the District Court did error under the relevant Virginia case law. And I'll turn directly to that. I want to emphasize what the defamatory meaning here is. Of course, under Virginia law, to be defamatory, the statement or the film here must only lower plaintiffs in the estimation of the community or tend to deter third persons from associating with him. In other words, the types of statements that throw shame or disgrace upon the plaintiff, hold them up to ridicule, make them look ridiculous. Here that is exactly what happened. What happened in the exchange? Plaintiffs who are experts and advocates on behalf of the Second Amendment and gun rights were invited to participate in this film, ostensibly to incorporate varied viewpoints in the film. The VCDL, an advocacy organization whose entire mission is devoted to Second Amendment rights, to gun rights, to being an expert on the associated firearms policy issues. Hawes and Webb, both VCDL executive members, Webb also a VCDL director, Hawes also a member of the VCDL Legal Advisory Council, Hawes an attorney whose practice specializes in Secondly, once on the program, the defendants asked the plaintiff a question about firearm policies, about background checks. And what happened? The plaintiffs answered that question for six full minutes. They responded for six minutes and a three minute long discussion ensued thereafter. But that's not what the film showed. What the film showed, defendants deleted that entire answer and affirmatively spliced in nine seconds of B-roll footage of the plaintiffs sitting, looking around the room, nine seconds of footage that the defendants surreptitiously recorded during a purported sound check when they expressly told the plaintiffs, please sit silently, don't say anything. That part is well taken and I think it's not very much in dispute in terms of what actually did happen. It was all pushed to, from the perspective of whether you're looking for the purpose of right or wrong, not defamation, to ask the question then leave like nine seconds as though you don't know the answer and actually take it from another part of the film. And I think a lot of apologies flow from that. But the question arises under Virginia law, does that defame the defendant? In other words, it's not enough to make one appear ignorant or ridiculous or whatever on it, but it has to do more than that under Virginia law. And that's kind of the nerve of where the trial judge was with this, is on the one hand, what happened contextually was about nine seconds, but you've got an interview that goes, spans for quite a while and they're able to articulate their answers very clearly during those time periods. So how do we deal with this? And that's probably the one that concerns me the most, quite frankly, is the defame aspect of it. Sure. How do we deal with that? Well, Judge Weber, I think you had a few questions baked in there, so I'll try to address them all in turn. First, it is sufficient under Virginia law to make the plaintiffs look ridiculous. Well, let's just stop there for a moment. You're familiar with the principle of law that we look at the other things, when you have a list of things and you look at them together and they relate to each other, right? Absolutely. So that the other terms that are given with ridiculous show us what ridiculous might mean in that context. If I say to my seven-year-old, that's just ridiculous, and I start laughing, that we would agree is not defamatory, right? I would absolutely agree with that. Even if I said that to you, it would not be defamatory to anybody. The gist. Okay. So what the Virginia case said was, to disgrace, put disgrace upon, or which intends to hold him up to scorn, ridicule, or contempt, which is calculated to render him infamous, odious, or ridiculous. So it is in that context we look at what ridiculous is. That's absolutely correct, Judge Motz. It seemed to me that that was sort of a fundamental problem with your argument here, that you wanted to take that ridiculous and separate it from this other language which tells them just what this kind of ridiculousness is, keeping you scorn upon them. Absolutely. And in this case, Judge Motz, we're not arguing that this portrayal made them look ridiculous in the context of personal feelings or subject to jests, like you would say to your seven-year-old child. Here, we are talking about ridiculous in the context of shame and disgrace. Infamous? Well, possibly infamous, but shame and disgrace are certainly— Scorn, ridicule, contempt, infamous? I think there are varying degrees, Judge Motz, of what constitutes being defamatory. Shame, disgrace? I think shame and disgrace fit in perfectly here. I'll put a pin on defamation per se for a moment and circle back to that, but to directly address that, I think this ties in also to Judge Wynn's question, that maybe if you have Joe Blow ask the question and can't provide an answer and is portrayed to look ignorant, that might not be defamatory. When you have an organization and individuals who are executive members of that organization whose sole purpose is to be advocates on a certain issue, they're expected to be experts on that issue, and to make experts look absolutely ignorant and incompetent in the subject at the heart of their trade, that crosses the line into defamatory. Here, to address the second part, or I guess third part of Judge Wynn's question, why is this portrayed—why are they portrayed incompetently or ignorantly if they answered other questions during the interview? The other questions during the interview, they did answer. But that doesn't change the fact that when presented with a question that cuts right to the heart of their advocacy about opposition to universal background checks, about being able to advocate on behalf of robust Second Amendment rights, they were portrayed as not even having the ability to answer. They sat, stumped, speechless, looking shamefully around the room, avoiding eye contact. And when they did that, that portrayed plaintiffs as shameful, as disgraceful, and we know that because as pleaded in the complaint— Well, I hear what you're saying. And you quoted that language to me again from a 1904 Virginia case. Fair. That's good law. But in 1998, the Virginia court further explained what you needed to have a cause of action here. Language that is insulting, offensive, or otherwise inappropriate, but constitutes no more than rhetorical hyperbole, is not actionable. That's absolutely true. Hear what we have. I mean, we may not like what's done here, but our American law has said that this kind of cause of action, you need really something quite terrible. You do. You need something terrible, and that's exactly what you have here. Now, the district court did not find that this was rhetorical hyperbole for opinion. Those are statements that are incapable of being defamatory at all. Here he said they're not defamatory. But let me pivot a little bit, because there's also a very strong line of case law in Virginia on defamation per se, and making someone appear incompetent or prejudicing those people in their trade. And are you making an argument both that this is defamation per se, because of the category of what we're talking about, and by implication? You know, they're two different things, and you're making both of those arguments, right? Right. The plaintiffs brought two claims here. One expressed defamation, one defamation by implication. We submit, and it was set forth in the complaint and pleaded, that the statements are defamatory per se. Even if they weren't defamatory per se, they're still defamatory, a little bit of a lesser showing that would be required to show something defamatory, as opposed to defamatory per se. Here, defamatory per se requires prejudice in one's trade or profession, or in the context of organizations, statements that cast dispersion on its honesty, its prestige, or its standing in its field. Here, again, that's exactly what happened. We show, the plaintiffs, or the defendants showed experts that they brought on for the express purpose of asking questions in their field. They were targeting Virginia, the defendants were, reached out specifically to the VCDL, said, hey, you are advocates on behalf of Second Amendment rights, come on this show, we're going to ask you questions, and we want to include your viewpoints. They did that. They brought them on to the show, and what did they do? What the district court referred to as dirty pool, which is true, but it goes even further, showed them as being completely incompetent advocates. Under settled Virginia law, the Foust case I would point to, where there were concerns about the competency of doctors. The Tronfeld case, where statements that an attorney just takes people's money is considered defamatory per se, because it suggests that the attorney is not good at his job. But to be clear, is this a case about defamatory per se, or defamatory by implication? Because you don't allege that the statute on his face, or that this action on his face, response on his face, was defamatory, you seem to allege that what it did was, it was defamatory because it made them appear to be ridiculous. That seems like by implication to me. There's two claims. There was the claim for defamation, actual literal falsity, and literal defamatory meaning, because the plaintiff's quotation was materially altered by the defendants. So there are two claims at issue, and one could be affirmed, one could be denied, and the baby could be split in that regard. Here, with the defamation claim, defamation per se theory of the defamation claim. But are you primarily resting upon defamation by implication, or per se? I think that's very important, in terms of where your argument is going. I think for the express defamation claim, Your Honor, it's more defamation per se, and the defamation by implication claim is more, as the name suggests, our implied defamation claim. Counsel, let me ask this question. Don't you have to have a statement, or at least that words that were used were altered? What you have here, Your Honor, is a material alteration of a statement. And wait a minute, they didn't alter a statement? They didn't give a statement at all? Well, Your Honor, respectfully, they did give a statement, but it was cut out affirmatively. Oh, no, no, no, no, no. What's, as we call it, what's left on the cutting room floor is of no moment. The question is, because what is published, and what is published is within the, not the four corners, but in from reel to reel, what was presented. What was the statement? If I may answer, Your Honor, with my time expired here. You're okay. Yes. For the moment. The statement was effectively this, and I think this ties in. I know the facts of the case, but this is a legal question, I mean, I know the facts. I'm talking about, there was no statement. If you'll indulge me for just a moment, Your Honor. Oh, you're fine. Go ahead. The statement is, effectively, I don't know, and I'm embarrassed about it. This is a case where technology, as Your Honors were discussing in the previous argument, has outpaced the common law definition. If this were a newspaper article, what would have had to have been said is that the plaintiffs were given this question and said, I don't know. Here in the TV area, you were able to dramatize and show a statement through lack of, rather, a clear expression of something, definition of statement, is being shown here by the plaintiff sitting speechless. It's a dramatization of, essentially, plaintiff saying, I don't know, and courts have repeatedly found actionable defamation based on deletions and omissions from statements, where it's the deletion that causes the defamatory meaning. That would be a different question, if, for example, you're talking about in your trade, if the question was, ma'am, sir, can you tell me what constitutional amendment even protects gun ownership? And you showed someone with nine seconds of silence. Then that would say, well, my goodness, you're a lawyer. You don't even know it's the Second Amendment? But this was a question that it's sort of ethereal, isn't it? If we don't have background checks, how can we stop terrorists from getting? That lends itself to all types of political, philosophical things that are beyond anyone's trade, isn't it? I respectfully disagree with that, Your Honor. Well, who was the criminologist that was presented? Who was the criminologist that was presented in that program? I don't know that there's a criminologist. There wasn't. There were people who had very legitimate reasons and reasoned opinions as to what the Second Amendment is and how it should be played out. But no one was put up for any ridicule that, oh, you're a criminologist, you don't even know anything about terrorism, or you're a lawyer, you don't even know it's the Second Amendment. This is a question that's in the hustings of people's own minds. This is what makes our country robust, because people have the right to have views about a lot of things. It's unfair, but how is that defamation that defamed them in a trade? Because they didn't give their answer, it was a very articulate answer they gave, and it was wrong and it was unfair. As Ms. Cork said, it's in the record, and so that was wrong. But the law of defamation is something different, right? Well, there's a lot baked in there, Your Honor. I'll try to sum it all up really quickly and thoroughly at the same time here in saying that, look, yes, robust debate is fantastic. People can agree to disagree about certain political, normative, subjective things. What you have here, if we were to remove guns, remove the Second Amendment from the context, and this were just a group of lawyers or a group of pharmacists, a group of mechanics asked questions about something central to their trade, and they're unable to respond. They're going to look like completely incompetent mechanics, pharmacists, lawyers. That's what we have here. We have advocates. They're advocates in the context of the Second Amendment, advocates and experts. They are made to look like they're fundamentally incompetent on their one and only mission. The VCDL exists for one purpose, to advocate for robust, in this case, Second Amendment rights. And they were portrayed as being completely unable to do so. And that's where you cross the line from something that makes you maybe look just ridiculous in the colloquial sense to lacking competence in your mission. Maybe in your rebuttal, you can tell us what Maryland, what Virginia case is best for you on that point, because it strikes me that none of them are close to you, none of them. A lawyer being called dishonest or incompetent, yes, that affects his trade. Or a doctor called a sexual predator, yes, that affects his trade. But we don't have that kind of thing here. But I leave it to you to find that case. I'll stand up here with that in about 20 minutes, Your Honor. Okay. Excellent. Thank you very much. Thank you, Joe. Good morning, Your Honors. May it please the Court. I'm Nathan Siegel for the Appellees. And I guess I agree with my opponent on one thing, that I think this case can be summed up fairly succinctly. There are two fundamental things, if you look at the record below, I think that the district court made clear that it concluded. Number one, I think it's fair to say that assuming that everything the plaintiff alleges in the complaint is true, as one must do on a 12b6 motion, the district court thought the edit was wrong. Well, your client has conceded it was wrong. There's no really argument about that. My client has issued some very robust public apologies about that. But the district court also correctly understood that that does not equate to it being defamatory. And there are really two fundamental principles, I think, of Virginia defamation law that support that and that are at issue here. And the two cases I would point to as most significant, perhaps, are the Schaefer case and the Webb v. Virginia Pilot case. What the Schaefer case makes clear is that there is a threshold, it uses the word threshold, of reprehensibility, of odiousness, whatever you want to call it. It has to rise to the level of a requisite defamatory sting in order to be defamatory. And I think that the simple conclusion, correctly by the district court, is that it is not a odious, it is not contemptuous, having answered seven questions in a media interview, which is what the film shows them doing, to not be able to answer, even assuming that's the worst construction that you could put on this, to have trouble or be stumped by one question on a matter of public policy. Of course, they rely on the ridiculous, the last thing. Yes. And actually, I would point directly on that point. The Schaefer case speaks to this. As we said in our brief, and probably don't need to reiterate it, there is a lot of case law saying, you know, a word is only good as the company it keeps. And ridiculous doesn't mean, in this context, just foolish, embarrassing, et cetera, which is really, I think, what they're alleging here, that it made them look a little silly. Is our consideration of the standard for defamation under Virginia law limited to the Schaefer case, or do we also look to the restatement towards Section 559? Well, I think that Section 559, as most restatement sections are, are pretty broadly worded, right? I think the Schaefer case is construing what it understands Section 559 to mean. Quoting it. Yes, it's quoting it, but it's also making it clear that we understand this to mean X. And I would point to a couple of things in the Schaefer case. One is, and I think this is on page 95 of the opinion, in describing why one of the statements at issue in that case doesn't rise to the level of defamation, and I would point out, I mean, one of the statements was, somebody's not being totally truthful with the planning board. That's a statement that I would argue, at least people could think, is more disgraceful than what we have here. But what the court said is, it wasn't defamatory because it, quote, doesn't harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating with him, such as by making the plaintiff appear odious, infamous, or ridiculous, et cetera, et cetera. So even there, I think it's making clear that these are simply, those are illustrative examples of different ways in which the general principle that you have some level of odiousness comes in. They try to argue that, well, it can be a substantial and respectable minority, right? But there are several problems with that argument. One is, that isn't actually part of the restatement that Virginia has ever quoted or adopted. But even assuming that that principle could have some application, it doesn't make any sense here, because they don't define what the minority is, right? But for a substantial and respectable minority, it still has to be a minority that would find it odious and contemptible, et cetera, et cetera. And I think what their argument really is, is that the court should recognize that any bona fide Second Amendment advocate must be able to easily answer that question. So it's odious and contemptible to bona fide supporters of gun rights not to have an answer. And I think the case law is clear that whatever substantial and respectable minority might mean, even if it is somehow a principle of Virginia law, it doesn't mean that. It's not defamatory to be for or against abortion, or to be for or against gun control, or to be for or against cutting or raising taxes, or to have trouble asking public policy questions about either one of them. So I don't think that that changes what the, to the extent that cases have applied the respectable minority principle. It has to do with, there may be some situations where there is a minority that holds views that are so odious, right, informants. Is that in tension with Schaeffer's use of the phrase common estimation of mankind? Yes, because I think what it made clear is that that has to be informed by whether in the common estimation of mankind there is a level of reprehensibility that it covers. And not having an answer to the eighth of Ms. Couric's question on a hypothetical public policy is simply not something that is contemptuous in the common estimation of mankind. I think a lot of people would have trouble answering that question. And so it simply doesn't rise to that level. And especially applied here. I mean, this is not a situation where people were made to portray as if they couldn't say anything. They answered lots of questions, and there was simply one that they were portrayed as having trouble answering. I'd like to go next to the, if I may, to the defamatory per se issue, which is where I think Mr. Oliveri led off. The test for occupational defamation in Virginia generally is the Fleming versus Moore case. It must be something that's necessarily hurtful to the plaintiff's business. And we would submit that the district court was correct, that this doesn't even come close. It moves from the implication to the per se. Yes. Because the allegation, at least what I'm understanding the per se argument to be, is that because it made them look ridiculous because of their occupation and because of their livelihoods. That's right. So look at, what are their occupations for purposes of that argument? The argument that they- I'll just educate a couple examples. One being the lawyer who's being called incompetent or whatever. So the argument here is that given what they, their advocacy, I guess, a livelihood in terms of advocacy or gun uses or whatever, that this segment here made them look ridiculous and affected them in their livelihood. Yes. That is the argument. But this is not a statement about Mr. Hawes' competence or capacity as a lawyer or Ms. Webb's competence or capacity as a gun store owner. Look at the own example that they used in their reply brief, right? They posed the hypothetical of a judicial nominee who's being individually interviewed as a lawyer to assess their judicial competence. And they're asked the question, you know, do you know what the Daubert standard is? And the statement is they can't answer it. Now the funny thing was when I read that, I thought about- That's a pretty close to the mark. Yeah. I thought about some of my transactional colleagues that I think they might take issue with whether that would be defamatory. But even assuming that that could be defamatory per se, right? That is everything that we don't have here. Mr. Hawes was one member of a group interview to which a general public policy question was being thrown out. He was not being interviewed as attorney. The question was not posed as a legal question. It was not posed to him or as an attorney. And it wasn't a question that was in any way designed or intended to assess the judicial competence of anybody. Was he introduced as a lawyer? He's simply identified as an attorney. Yes. The, you know, people are identified not as gun rights advocates. One is as a secretary, one is as a systems engineer, one is an attorney, et cetera. And so, and even if it could somehow be construed to imply something about him as an attorney, it doesn't rise close to the level of what Virginia courts have held as necessary for occupational defamation. I mean, there's the Park versus Vector Resources case from the Virginia Supreme Court, which involved an allegation that a lawyer who was involved in debt collection didn't report the debts that he had collected to his client. Sounds like something that is a little more serious of an allegation, and yet the court said that didn't rise to the level of it because it's not something that is necessarily claiming that he is unfit to practice law, that he is an incompetent as a lawyer. Or the Spencer case that we cited, which was much more serious, a lawyer who made a mistake, failed to file a transcript, and his appeal was bounced. Again, this is nothing like that, and this is something, a group interview. Same thing with Ms. Webb. Her argument, essentially, is that it's defamatory for a gun store owner not to immediately be interviewed to debunk a law that she's supposed to follow. And it's simply not odious or contemptible for a gun store owner not to have an answer to that question. I mean, it's not odious, or he could be a gun store owner, as the district court said, and think a lot of different things about gun control or a lot of different issues. And as to their argument, and this is something that they've really shifted, because look closely at the complaint. It's not pled. It's in page 50 of the joint appendix when they articulate their theories of defamation per se. Essentially, what they're now trying to say is, well, they were defamed because they're advocates, right? That's not their trade. They're identified as members of the Virginia Citizens Defense League. There is no case that they have cited, and we've cited lots of cases to the contrary, that says, simply because I'm a member of my synagogue or even on the board of my synagogue and somebody makes a statement about my religious beliefs, that's defamatory of me and my trade, profession, or employment. There's just no authority for that proposition, and I think that's stretching the definition of per se defamation far beyond anything in Virginia or anywhere else. What about the Virginia Citizens Defense League? I was going to go to that next, to the organization. I think there are two problems there. Number one is, and I'll deal with the oven concerning issue second, although I think it is kind of a threshold problem for all of the claims by it. But a lot weaker than where you are with defamation. I'm sorry? The oven concerning it, that position is a lot weaker than where you are right now. Oh, okay. Well, I suppose. I take the point. I suppose I would respectfully disagree with it. I don't know. It looks weak to me, but you tell me it's not. Okay. I'll go to that then. This is why I actually think it's not. There is no statement or implication that everything that somebody said or didn't say in that interview is a statement by or behalf of the organization. At some level, you can't stump an organization. I think that just on a basic level of intuition, an advocacy organization can't be defamed simply because some of its volunteer members have trouble answering, stumble over one of eight questions in a media interview. You think about what it would really mean to say this is oven concerning the, and there are a plethora of cases that say that. Look at the actual interview here. Even look at this particular exchange in the interview. The panel members in the course of this interview often disagree with each other. I mean, sometimes quite sharply, right? If you go into, look at about, I think it's at eight minutes and ten seconds of the. What issue are you addressing now? Oven concerning. I'm sorry. I realize I'm going off, but the way this relates to oven concerning is that you can't construe a statement that people make. They're not speaking for one group. They're not speaking for one group. They're not even speaking with one voice. They often disagree. But I don't know that's necessarily true. Do you introduce these members of this group? That's right. So, I mean, why is that not sufficient? I don't think that's your strongest argument. You could get the three of us to come talk to your law firm and say these are a group of federal judges. We'd still be federal judges even if we disagreed and we have disagreed with each other. If I will again, they can't always see the light. I don't think that necessarily means we're not in the same organization. Fair enough. I take the direction. So, going to the organization on the fundamental question, again, I mean, it really isn't a fundamental question. Is it defamatory or not, right? Is it defamatory per se? The theory, again, is that because several members couldn't answer one of eight questions in a media interview, therefore, it implies that the organization as a whole is unfit to advocate for Second Amendment rights. And again, that sort of requires the court to decide, well, what makes an organization fit or unfit to advocate for Second Amendment rights? I mean, even in the film itself, for example, if you look later on, there are a number of NRA members who are interviewed and say, well, actually, we support background checks. And there are other NRA members who disagree about whether or not people on the terrorism watch list should or shouldn't be eligible to buy guns. But we wouldn't say that, you know, the NFR is defamed, the NRA has been defamed because some of its members support background checks. And even if it weren't true that those particular members support background checks, we wouldn't say the organization as a whole is defamed. Again, it's simply not odious and contemptible for an organization of any kind to have eight volunteer members who have trouble answering one question about a hypothetical question of public policy in a media interview under any standard of defamation. It just simply doesn't rise to the level of defamation or defamation per se. Mr. Siegel, what are your positions? You stand behind a district court, put a lot of eggs in a basket of this is not false. And made a determination that when you listen to the full response, one could say it equated to no answer. And that's what he said. So what do we do with that? Can that reasoning alone support, in your view, a finding or affirming? Well, I think one of the members that you have two options, obviously. One is you can, you could, if you agree that the defamatory meaning part of it. We've been back in weak territory. I guarantee, I certainly understand that the rest of the question is, but this is why. This is, and I acknowledge that particularly the district court's decision on this was relatively terse, right? So you kind of have to try to unpack it. Well, you didn't make this argument to the district court. Well, actually, we made the argument that we made to the district court was, I think, the argument. You made the argument that it wasn't false? We said, yeah, we said that it was, I said that we said that it's not literally inaccurate because. That strikes me as a little different than what. That's fair. And I think the district court may have taken that. We made an argument not unlike, I think, the one that Judge Gregory threw a question at. We pointed out that, well, what exactly is inaccurate about it? I mean, on different levels, none of the people who are actually suing us did answer the question within, you know, eight or nine seconds. And I think the district court may have taken that, agreed, and made a slightly different point. But here's what, and of course, the analysis of falsity has to be a little bit different, I guess, is to each. You say that filmmakers deliberately altered the footage to make it appear as though the members were set is not false. Here's my response to that. It's not materially false. It clearly is factually false, but not materially false. What does materially mean? Well, if you set up a film and you know that they had an answer, and you go take a silent section from another set of film, stick it in there, and maybe they're moving or doing this whole thing, and you do it deliberately, that sounds false to me. Well, it only if, the standard for material falsity under the Mason case, right, is whether it would have a different effect, whether doing that has a different effect on the mind of the viewer than showing the person's actual statement. And I think at least with respect, for example, to Mr. Hawes, his actual response to the question. So you think their responses were so terrible that just having this seven-second or eight-second pause. That's a fair summary of my position. I thought you would go a different way and say it's not material because in this context, it's not defamatory. It doesn't matter because what they say, a response to a really a political question, that's what it really was, a political question, is that if I cut that out, it can't be, it's not defamatory. I mean, it would seem to me it would have to be something that you cut out that otherwise, like a physician didn't know what surgical procedure was, a lawyer didn't even know what a tort was or what it means to have a tort versus a contract, something like that. But it's not susceptible, it seems to me. I mean, the question in terms of materiality of that. I mean, but certainly there are some things of silence that probably could be. But I think that's the, I mean, but go ahead. No, I think that's right. And we actually, I think we, somewhere in the briefs and it was, may have been on a related point in the district court. We simply pointed out, for example, with regard to Mr. Hawes, I mean, essentially his answer to the question is, it's an unconstitutional prior restraint to ever check somebody's ID to enforce an eligibility law, right? That you can never do anything to try to catch bad guys before they do something bad. Well, I mean, that's just not true. I mean, I passed through a security check, you know, on my way up to the courtroom, which presumably was an effort to check whether I was a bad guy intending to do something bad. Bar owners check people's IDs to see whether they are eligible to buy a drink. Essentially, that's a background check. It's no different. And so the argument, I mean, our position would simply be that the filmmakers could have put on that answer, could also put on an expert to say, that's just totally mischaracterizing what the law is. And the effect of that on the reader wouldn't have been any different than simply showing him not answer the question. Right. That that's that's my that was simply the point that it's that that is teasing out a little bit more the the the point that if you actually looked at their actual answers. See, I thought you were making and the district court had made an independent argument that this wasn't false. In other words, assume that, in fact, it's libelous, it's defamatory. Right. It's not false. It's not. So then the fact that you can't wind in and say it's it's not false because it's not defamatory because then they're the same. No, no, no. I agree with that. I agree. I think that they are independent issues. The only point we're saying is that if you know, and I read your brief as sort of throwing this argument under the bus since it came at page forty eight of your 52 page brief, I like to I'll let my brief speak for themselves. So I think I probably cover everything here that that, you know, we think is at issue in this case. The court doesn't have any other questions. I don't think so. Thank you. Your Honor, so what defendants are really asking for here is license to do exactly what they did, delete people's answers to questions and portray that and get away with it. You asked Judge Motz, you asked for a couple of cases. I assure you that goes to the falsity side, what you just said. It goes to falsity. And I want to get to Judge Motz's question. No, you answered it. It also goes to defamatory meaning where you have here a group of advocates, a group of experts who are made to look like look completely incompetent. And this ties right into the case on Virginia. Statements have been held defamatory per se for less. I mentioned the Foust case earlier involving concerns about the competence of doctors. The statements there were that the doctor at issue was unprofessional, was uncooperative, there were concerns about his performance. The Cassian v. Smith case also, Virginia Supreme Court cited in the briefing that the doctor made a poor effort. A couple of EDVA cases applying Virginia law, the Andrews case we cite in our brief where a professor misadvised students, a professor's job is to advise and teach students. He was accused of being unable to advise, being, misadvising those students. That was held defamatory per se. Here we have a group of people, experts, advocates. Let's take away the Second Amendment part for a moment. We're not relying just on ridiculous. We're looking at both shameful and disgraceful and further defamatory per se. A group of experts who are asked a question, a factual question. It's not a political question. It's an answer. It's a question. Is it possible without background checks? How do you stop felons or terrorists from obtaining guns? The answer to that question that both Webb, plaintiff Webb and plaintiff Hawes gave was to challenge the premises of the question. The premises underlying that question is false. So it is an answerable question. It's not just a political question that people can agree to disagree on. And it's a matter that goes right to their trade. Mr. Siegel mentioned the term occupational defamation a lot. There is an answer to the question that people don't disagree on. Don't disagree on. I'm sorry, Your Honor. He said there is an answer to that question. Right. The question is a factual question that can be answered. Well, wait a minute. It's a factual question. Can you answer? No, it's a question that a person could give a response to. Well, that's certainly true. Yeah. You can give a response to it, but actually say that's a fact. Question is, how do you stop a terrorist from getting a gun if you don't have back that's not susceptible to a factual or necessary response, but a response. I'm not sure. A hypothetical or counterfactual, whichever you want to call it. Sure. Suppose they had said near the end of the program, we asked this gentleman, if you don't have background checks, how could you stop terrorists from getting weapons? He gave a response, but we don't think it was adequate. Good night. Would that be? Would that be defamatory? That'd be a lot different because you're acknowledging that he gave a response and then you have an opinion as to the adequacy of it. But your honor, you. All right. All right. Just change the hypothetical slightly. And instead, they say, we asked the gentleman this question. But we're not going to view his response. We don't think it was worthwhile. Again, that's that's that's different. At least you're right. Well, what did they say? We asked the gentleman the question and there was no response. That's defamatory. It's a lot closer of a question, your honor. And but I think, Judge Gregory, you hit the nail on the head a moment ago. I said answer. I should have said response because there was a response here. It was capable of being responded to in the the plaintiffs here. Their answer was responsive to the question and showing showing advocates, showing experts as completely unable, physically unable to even attempt to advocate, even attempt to show their knowledge. This isn't a question about someone, a lawyer, maybe stumbling, stumbling on an answer to a hard question. This is absolutely sitting in shameful stump silence for nine full seconds. And to touch on the, you know, the profession, occupation, trade. My counterpart mentioned the phrase occupational defamation a lot. It's a good turn of phrase, but it's not in the case. All the case law is that it whether something prejudices a person in his profession or his trade here. We have plaintiff's paws and web. We're being interviewed as executive board members, a director, a legal advisory council member and all executive members of the VCDL in their capacity as advocates, as subject matter experts. And they were portrayed as absolutely incompetent in that trade. Thank you, your honors. Thank you so much, counsel. I'm fine. Yeah, we go to the last. I will come down, greet counsel and proceed to our final case for the day.
judges: Roger L. Gregory, Diana Gribbon Motz, James A. Wynn Jr.